(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MORSE ET AL. *v.* FREDERICK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–278.   Argued March 19, 2007—Decided June 25, 2007

At a school-sanctioned and school-supervised event, petitioner Morse, the high school principal, saw students unfurl a banner stating "BONG HiTS 4 JESUS," which she regarded as promoting illegal drug use.  Consistent with established school policy prohibiting such messages at school events, Morse directed the students to take down the banner.  When one of the students who had brought the banner to the event—respondent Frederick—refused, Morse confiscated the banner and later suspended him.  The school superintendent upheld the suspension, explaining, *inter alia*, that Frederick was disciplined because his banner appeared to advocate illegal drug use in violation of school policy.  Petitioner school board also upheld the suspension. Frederick filed suit under 42 U. S. C. §1983, alleging that the school board and Morse had violated his First Amendment rights.  The District Court granted petitioners summary judgment, ruling that they were entitled to qualified immunity and that they had not infringed Frederick's speech rights.  The Ninth Circuit reversed.  Accepting that Frederick acted during a school-authorized activity and that the banner expressed a positive sentiment about marijuana use, the court nonetheless found a First Amendment violation because the school punished Frederick without demonstrating that his speech threatened substantial disruption.  It also concluded that Morse was not entitled to qualified immunity because Frederick's right to display the banner was so clearly established that a reasonable principal in Morse's position would have understood that her actions were unconstitutional.

*Held:* Because schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use, the school officials in this case did not violate the

First Amendment by confiscating the pro-drug banner and suspend-ing Frederick.  Pp. 5–15.

(a) Frederick's argument that this is not a school speech case is re-jected.  The event in question occurred during normal school hours and was sanctioned by Morse as an approved social event at which the district's student-conduct rules expressly applied.  Teachers and administrators were among the students and were charged with su-pervising them.  Frederick stood among other students across the street from the school and directed his banner toward the school, making it plainly visible to most students.  Under these circum-stances, Frederick cannot claim he was not at school.  Pp. 5–6.

(b) The Court agrees with Morse that those who viewed the banner would interpret it as advocating or promoting illegal drug use, in vio-lation of school policy.  At least two interpretations of the banner's words—that they constitute an imperative encouraging viewers to smoke marijuana or, alternatively, that they celebrate drug use—demonstrate that the sign promoted such use.  This pro-drug inter-pretation gains further plausibility from the paucity of alternative meanings the banner might bear.  Pp. 6–8.

(c) A principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use.  In *Tinker* v. *Des Moines Inde-pendent Community School Dist.*, 393 U. S. 503, the Court declared, in holding that a policy prohibiting high school students from wear-ing antiwar armbands violated the First Amendment, *id.,* at 504, that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school," *id.,* at 513.  The Court in *Be-thel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, however, upheld the suspension of a student who delivered a high school assembly speech employing "an elaborate, graphic, and explicit sexual meta-phor," *id.,* at 678.  Analyzing the case under *Tinker*, the lower courts had found no disruption, and therefore no basis for discipline.  478 U. S*.,* at 679–680.  This Court reversed, holding that the school was "within its permissible authority in imposing sanctions . . . in re-sponse to [the student's] offensively lewd and indecent speech." *Id.,* at 685.  Two basic principles may be distilled from *Fraser*.  First, it demonstrates that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.,* at 682.  Had Fraser delivered the same speech in a public forum outside the school context, he would have been pro-tected.  See, *id.,* at 682–683.  In school, however, his First Amend-ment rights were circumscribed "in light of the special characteristics of the school environment." *Tinker*, *supra,* at 506. Second, *Fraser* es-

tablished that *Tinker*'s mode of analysis is not absolute, since the *Fraser* Court did not conduct the "substantial disruption" analysis. Subsequently, the Court has held in the Fourth Amendment context that "while children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' . . . the nature of those rights is what is appropriate for children in school," *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655–656, and has recognized that deterring drug use by schoolchildren is an "important—indeed, perhaps compelling" interest, *id.,* at 661. Drug abuse by the Nation's youth is a serious problem. For example, Congress has declared that part of a school's job is educating students about the dangers of drug abuse, see, *e.g.,* the Safe and Drug-Free Schools and Communities Act of 1994, and petitioners and many other schools have adopted policies aimed at implementing this message. Student speech celebrating illegal drug use at a school event, in the presence of school administrators and teachers, poses a particular challenge for school officials working to protect those entrusted to their care. The "special characteristics of the school environment," *Tinker,* 393 U. S., at 506, and the governmental interest in stopping student drug abuse allow schools to restrict student expression that they reasonably regard as promoting such abuse. *Id.,* at 508, 509, distinguished. Pp. 8–15.

439 F. 3d 1114, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed a concurring opinion, in which KENNEDY, J., joined. BREYER, J., filed an opinion concurring in the judgment in part and dissenting in part. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–278

DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

At a school-sanctioned and school-supervised event, a high school principal saw some of her students unfurl a large banner conveying a message she reasonably regarded as promoting illegal drug use. Consistent with established school policy prohibiting such messages at school events, the principal directed the students to take down the banner. One student—among those who had brought the banner to the event—refused to do so. The principal confiscated the banner and later suspended the student. The Ninth Circuit held that the principal's actions violated the First Amendment, and that the student could sue the principal for damages.

Our cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969). At the same time, we have held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel School*

*Dist. No. 403* v. *Fraser*, 478 U. S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 266 (1988) (quoting *Tinker*, *supra,* at 506). Consistent with these principles, we hold that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. We conclude that the school officials in this case did not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it.

I

On January 24, 2002, the Olympic Torch Relay passed through Juneau, Alaska, on its way to the winter games in Salt Lake City, Utah. The torchbearers were to proceed along a street in front of Juneau-Douglas High School (JDHS) while school was in session. Petitioner Deborah Morse, the school principal, decided to permit staff and students to participate in the Torch Relay as an approved social event or class trip. App. 22–23. Students were allowed to leave class to observe the relay from either side of the street. Teachers and administrative officials monitored the students' actions.

Respondent Joseph Frederick, a JDHS senior, was late to school that day. When he arrived, he joined his friends (all but one of whom were JDHS students) across the street from the school to watch the event. Not all the students waited patiently. Some became rambunctious, throwing plastic cola bottles and snowballs and scuffling with their classmates. As the torchbearers and camera crews passed by, Frederick and his friends unfurled a 14-foot banner bearing the phrase: "BONG HiTS 4 JESUS." App. to Pet. for Cert. 70a. The large banner was easily readable by the students on the other side of the street.

Principal Morse immediately crossed the street and

demanded that the banner be taken down. Everyone but Frederick complied. Morse confiscated the banner and told Frederick to report to her office, where she suspended him for 10 days. Morse later explained that she told Frederick to take the banner down because she thought it encouraged illegal drug use, in violation of established school policy. Juneau School Board Policy No. 5520 states: "The Board specifically prohibits any assembly or public expression that . . . advocates the use of substances that are illegal to minors . . . ." *Id.,* at 53a. In addition, Juneau School Board Policy No. 5850 subjects "[p]upils who participate in approved social events and class trips" to the same student conduct rules that apply during the regular school program. *Id.,* at 58a.

Frederick administratively appealed his suspension, but the Juneau School District Superintendent upheld it, limiting it to time served (8 days). In a memorandum setting forth his reasons, the superintendent determined that Frederick had displayed his banner "in the midst of his fellow students, during school hours, at a school-sanctioned activity." *Id.,* at 63a. He further explained that Frederick "was not disciplined because the principal of the school 'disagreed' with his message, but because his speech appeared to advocate the use of illegal drugs." *Id.,* at 61a.

The superintendent continued:

"The common-sense understanding of the phrase 'bong hits' is that it is a reference to a means of smoking marijuana. Given [Frederick's] inability or unwillingness to express any other credible meaning for the phrase, I can only agree with the principal and countless others who saw the banner as advocating the use of illegal drugs. [Frederick's] speech was not political. He was not advocating the legalization of marijuana or promoting a religious belief. He was displaying a

> fairly silly message promoting illegal drug usage in the midst of a school activity, for the benefit of television cameras covering the Torch Relay. [Frederick's] speech was potentially disruptive to the event and clearly disruptive of and inconsistent with the school's educational mission to educate students about the dangers of illegal drugs and to discourage their use." *Id.,* at 61a–62a.

Relying on our decision in *Fraser*, *supra*, the superintendent concluded that the principal's actions were permissible because Frederick's banner was "speech or action that intrudes upon the work of the schools." App. to Pet. for Cert. 62a (internal quotation marks omitted). The Juneau School District Board of Education upheld the suspension.

Frederick then filed suit under 42 U. S. C. §1983, alleging that the school board and Morse had violated his First Amendment rights. He sought declaratory and injunctive relief, unspecified compensatory damages, punitive damages, and attorney's fees. The District Court granted summary judgment for the school board and Morse, ruling that they were entitled to qualified immunity and that they had not infringed Frederick's First Amendment rights. The court found that Morse reasonably interpreted the banner as promoting illegal drug use—a message that "directly contravened the Board's policies relating to drug abuse prevention." App. to Pet. for Cert. 36a–38a. Under the circumstances, the court held that "Morse had the authority, if not the obligation, to stop such messages at a school-sanctioned activity." *Id.,* at 37a.

The Ninth Circuit reversed. Deciding that Frederick acted during a "school-authorized activit[y]," and "proceed[ing] on the basis that the banner expressed a positive sentiment about marijuana use," the court nonetheless found a violation of Frederick's First Amendment rights because the school punished Frederick without demon-

strating that his speech gave rise to a "risk of substantial disruption." 439 F. 3d 1114, 1118, 1121–1123 (2006). The court further concluded that Frederick's right to display his banner was so "clearly established" that a reasonable principal in Morse's position would have understood that her actions were unconstitutional, and that Morse was therefore not entitled to qualified immunity. *Id.,* at 1123–1125.

We granted certiorari on two questions: whether Frederick had a First Amendment right to wield his banner, and, if so, whether that right was so clearly established that the principal may be held liable for damages. 549 U. S. ___ (2006). We resolve the first question against Frederick, and therefore have no occasion to reach the second.[1]

## II

At the outset, we reject Frederick's argument that this is not a school speech case—as has every other authority to address the question. See App. 22–23 (Principal Morse); App. to Pet. for Cert. 63a (superintendent); *id.,* at 69a (school board); *id.,* at 34a–35a (District Court); 439 F. 3d, at 1117 (Ninth Circuit). The event occurred during

––––––––––

[1] JUSTICE BREYER would rest decision on qualified immunity without reaching the underlying First Amendment question. The problem with this approach is the rather significant one that it is inadequate to decide the case before us. Qualified immunity shields public officials from money damages only. See *Wood* v. *Strickland,* 420 U. S. 308, 314, n. 6 (1975). In this case, Frederick asked not just for damages, but also for declaratory and injunctive relief. App. 13. JUSTICE BREYER's proposed decision on qualified immunity grounds would dispose of the damages claims, but Frederick's other claims would remain unaddressed. To get around that problem, JUSTICE BREYER hypothesizes that Frederick's suspension—the target of his request for injunctive relief—"may well be justified on non-speech-related grounds." See *post,* at 9. That hypothesis was never considered by the courts below, never raised by any of the parties, and is belied by the record, which nowhere suggests that the suspension would have been justified solely on non-speech-related grounds.

normal school hours. It was sanctioned by Principal Morse "as an approved social event or class trip," App. 22–23, and the school district's rules expressly provide that pupils in "approved social events and class trips are subject to district rules for student conduct." App. to Pet. for Cert. 58a. Teachers and administrators were interspersed among the students and charged with supervising them. The high school band and cheerleaders performed. Frederick, standing among other JDHS students across the street from the school, directed his banner toward the school, making it plainly visible to most students. Under these circumstances, we agree with the superintendent that Frederick cannot "stand in the midst of his fellow students, during school hours, at a school-sanctioned activity and claim he is not at school." *Id.,* at 63a. There is some uncertainty at the outer boundaries as to when courts should apply school-speech precedents, see *Porter* v. *Ascension Parish School Bd.*, 393 F. 3d 608, 615, n. 22 (CA5 2004), but not on these facts.

## III

The message on Frederick's banner is cryptic. It is no doubt offensive to some, perhaps amusing to others. To still others, it probably means nothing at all. Frederick himself claimed "that the words were just nonsense meant to attract television cameras." 439 F. 3d, at 1117–1118. But Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one.

As Morse later explained in a declaration, when she saw the sign, she thought that "the reference to a 'bong hit' would be widely understood by high school students and others as referring to smoking marijuana." App. 24. She further believed that "display of the banner would be construed by students, District personnel, parents and others witnessing the display of the banner, as advocating

or promoting illegal drug use"—in violation of school policy. *Id.,* at 25; see *ibid.* ("I told Frederick and the other members of his group to put the banner down because I felt that it violated the [school] policy against displaying . . . material that advertises or promotes use of illegal drugs").

We agree with Morse. At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs. First, the phrase could be interpreted as an imperative: "[Take] bong hits . . ."—a message equivalent, as Morse explained in her declaration, to "smoke marijuana" or "use an illegal drug." Alternatively, the phrase could be viewed as celebrating drug use—"bong hits [are a good thing]," or "[we take] bong hits"—and we discern no meaningful distinction between celebrating illegal drug use in the midst of fellow students and outright advocacy or promotion. See *Guiles* v. *Marineau*, 461 F. 3d 320, 328 (CA2 2006) (discussing the present case and describing the sign as "a clearly pro-drug banner").

The pro-drug interpretation of the banner gains further plausibility given the paucity of alternative meanings the banner might bear. The best Frederick can come up with is that the banner is "meaningless and funny." 439 F. 3d, at 1116. The dissent similarly refers to the sign's message as "curious," *post,* at 1, "ambiguous," *ibid.*, "nonsense," *post,* at 2, "ridiculous," *post,* at 6, "obscure," *post,* at 7, "silly," *post,* at 12, "quixotic," *post,* at 13, and "stupid," *ibid.* Gibberish is surely a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores its undeniable reference to illegal drugs.

The dissent mentions Frederick's "credible and uncontradicted explanation for the message—he just wanted to get on television." *Post,* at 12. But that is a description of Frederick's *motive* for displaying the banner; it is not an

interpretation of what the banner says. The *way* Frederick was going to fulfill his ambition of appearing on television was by unfurling a pro-drug banner at a school event, in the presence of teachers and fellow students.

Elsewhere in its opinion, the dissent emphasizes the importance of political speech and the need to foster "national debate about a serious issue," *post,* at 16, as if to suggest that the banner is political speech. But not even Frederick argues that the banner conveys any sort of political or religious message. Contrary to the dissent's suggestion, see *post,* at 14–16, this is plainly not a case about political debate over the criminalization of drug use or possession.

## IV

The question thus becomes whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use. We hold that she may.

In *Tinker*, this Court made clear that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." 393 U. S., at 506. *Tinker* involved a group of high school students who decided to wear black armbands to protest the Vietnam War. School officials learned of the plan and then adopted a policy prohibiting students from wearing armbands. When several students nonetheless wore armbands to school, they were suspended. *Id.,* at 504. The students sued, claiming that their First Amendment rights had been violated, and this Court agreed.

*Tinker* held that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Id.,* at 513. The essential facts of

*Tinker* are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech, using the armbands to express their "disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Id.,* at 514. Political speech, of course, is "at the core of what the First Amendment is designed to protect." *Virginia* v. *Black*, 538 U. S. 343, 365 (2003). The only interest the Court discerned underlying the school's actions was the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," or "an urgent wish to avoid the controversy which might result from the expression." *Tinker*, 393 U. S., at 509, 510. That interest was not enough to justify banning "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.,* at 508.

This Court's next student speech case was *Fraser*, 478 U. S. 675. Matthew Fraser was suspended for delivering a speech before a high school assembly in which he employed what this Court called "an elaborate, graphic, and explicit sexual metaphor." *Id.,* at 678. Analyzing the case under *Tinker*, the District Court and Court of Appeals found no disruption, and therefore no basis for disciplining Fraser. 478 U. S., at 679–680. This Court reversed, holding that the "School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech." *Id.,* at 685.

The mode of analysis employed in *Fraser* is not entirely clear. The Court was plainly attuned to the content of Fraser's speech, citing the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech." *Id.,* at 680. But the Court also reasoned that school boards have the authority to determine "what manner of speech in the classroom or

in school assembly is inappropriate." *Id.,* at 683.   Cf. *id.,* at 689 (Brennan, J., concurring in judgment) ("In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate [Fraser's] speech because they disagreed with the views he sought to express").

   We need not resolve this debate to decide this case.  For present purposes, it is enough to distill from *Fraser* two basic principles.  First, *Fraser*'s holding demonstrates that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.,* at 682.  Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected.  See *Cohen* v. *California*, 403 U. S. 15 (1971); *Fraser*, *supra,* at 682–683.  In school, however, Fraser's First Amendment rights were circum-scribed "in light of the special characteristics of the school environment." *Tinker*, *supra,* at 506.  Second, *Fraser* established that the mode of analysis set forth in *Tinker* is not absolute.  Whatever approach *Fraser* employed, it certainly did not conduct the "substantial disruption" analysis prescribed by *Tinker, supra,* at 514.  See *Kuhl-meier*, 484 U. S., at 271, n. 4 (disagreeing with the proposi-tion that there is "no difference between the First Amendment analysis applied in *Tinker* and that applied in *Fraser*," and noting that the holding in *Fraser* was not based on any showing of substantial disruption).

   Our most recent student speech case, *Kuhlmeier*, con-cerned "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."  484 U. S., at 271.  Staff members of a high school newspaper sued their school when it chose not to publish two of their articles.  The Court of Appeals analyzed the case under *Tinker*, ruling in favor of the students because it found no evidence of mate-

rial disruption to classwork or school discipline. 795 F. 2d 1368, 1375 (CA8 1986). This Court reversed, holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Kuhlmeier, supra,* at 273.

*Kuhlmeier* does not control this case because no one would reasonably believe that Frederick's banner bore the school's imprimatur. The case is nevertheless instructive because it confirms both principles cited above. *Kuhlmeier* acknowledged that schools may regulate some speech "even though the government could not censor similar speech outside the school." *Id.,* at 266. And, like *Fraser*, it confirms that the rule of *Tinker* is not the only basis for restricting student speech.[2]

Drawing on the principles applied in our student speech cases, we have held in the Fourth Amendment context that "while children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' . . . the nature of those rights is what is appropriate for children in school." *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655–656 (1995) (quoting *Tinker, supra,* at 506). In particular, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 340 (1985). See *Vernonia, supra,* at 656 ("Fourth Amendment rights,

--------

[2] The dissent's effort to find inconsistency between our approach here and the opinion in *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, 551 U. S. \_\_\_ (2007), see *post,* at 12 (opinion of STEVENS, J.), overlooks what was made clear in *Tinker*, *Fraser*, and *Kuhlmeier*: student First Amendment rights are "applied in light of the special characteristics of the school environment." *Tinker*, 393 U. S., at 506. See *Fraser*, 478 U. S., at 682; *Kuhlmeier*, 484 U. S., at 266. And, as discussed above, *supra,* at 8, there is no serious argument that Frederick's banner is political speech of the sort at issue in *Wisconsin Right to Life*.

no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere . . .”); *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 829-830 (2002) (“‘special needs’ inhere in the public school context”; “[w]hile school-children do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights . . . are different in public schools than elsewhere; the ‘reasonableness’ inquiry cannot disregard the schools’ custodial and tutelary responsibility for children” (quoting *Vernonia*, 515 U. S., at 656; citation and some internal quotation marks omitted).

Even more to the point, these cases also recognize that deterring drug use by schoolchildren is an “important—indeed, perhaps compelling” interest. *Id.,* at 661. Drug abuse can cause severe and permanent damage to the health and well-being of young people:

> “School years are the time when the physical, psychological, and addictive effects of drugs are most severe. Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound; children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor. And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.” *Id.,* at 661–662 (citations and internal quotation marks omitted).

Just five years ago, we wrote: “The drug abuse problem among our Nation’s youth has hardly abated since *Vernonia* was decided in 1995. In fact, evidence suggests that it has only grown worse.” *Earls*, *supra,* at 834, and n. 5.

The problem remains serious today. See generally 1 National Institute on Drug Abuse, National Institutes of

Health, Monitoring the Future: National Survey Results on Drug Use, 1975–2005, Secondary School Students (2006). About half of American 12th graders have used an illicit drug, as have more than a third of 10th graders and about one-fifth of 8th graders. *Id.,* at 99. Nearly one in four 12th graders has used an illicit drug in the past month. *Id.,* at 101. Some 25% of high schoolers say that they have been offered, sold, or given an illegal drug on school property within the past year. Dept. of Health and Human Services, Centers for Disease Control and Prevention, Youth Risk Behavior Surveillance—United States, 2005, 55 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS–5, p. 19 (June 9, 2006).

Congress has declared that part of a school's job is educating students about the dangers of illegal drug use. It has provided billions of dollars to support state and local drug-prevention programs, Brief for United States as *Amicus Curiae* 1, and required that schools receiving federal funds under the Safe and Drug-Free Schools and Communities Act of 1994 certify that their drug prevention programs "convey a clear and consistent message that . . . the illegal use of drugs [is] wrong and harmful." 20 U. S. C. §7114(d)(6) (2000 ed., Supp. IV).

Thousands of school boards throughout the country—including JDHS—have adopted policies aimed at effectuating this message. See Pet. for Cert. 17–21. Those school boards know that peer pressure is perhaps "the single most important factor leading schoolchildren to take drugs," and that students are more likely to use drugs when the norms in school appear to tolerate such behavior. *Earls*, *supra,* at 840 (BREYER, J., concurring). Student speech celebrating illegal drug use at a school event, in the presence of school administrators and teachers, thus poses a particular challenge for school officials working to protect those entrusted to their care from the dangers of drug abuse.

The "special characteristics of the school environment,"
*Tinker*, 393 U. S., at 506, and the governmental interest in
stopping student drug abuse—reflected in the policies of
Congress and myriad school boards, including JDHS—
allow schools to restrict student expression that they
reasonably regard as promoting illegal drug use. *Tinker*
warned that schools may not prohibit student speech
because of "undifferentiated fear or apprehension of dis-
turbance" or "a mere desire to avoid the discomfort and
unpleasantness that always accompany an unpopular
viewpoint." *Id.,* at 508, 509. The danger here is far more
serious and palpable. The particular concern to prevent
student drug abuse at issue here, embodied in established
school policy, App. 92–95; App. to Pet. for Cert. 53a, ex-
tends well beyond an abstract desire to avoid controversy.

Petitioners urge us to adopt the broader rule that Fre-
derick's speech is proscribable because it is plainly "offen-
sive" as that term is used in *Fraser*. See Reply Brief for
Petitioners 14–15. We think this stretches *Fraser* too far;
that case should not be read to encompass any speech that
could fit under some definition of "offensive." After all,
much political and religious speech might be perceived as
offensive to some. The concern here is not that Frederick's
speech was offensive, but that it was reasonably viewed as
promoting illegal drug use.

Although accusing this decision of doing "serious vio-
lence to the First Amendment" by authorizing "viewpoint
discrimination," *post,* at 2, 5 (opinion of STEVENS, J.), the
dissent concludes that "it might well be appropriate to
tolerate some targeted viewpoint discrimination in this
unique setting," *post,* at 6–7. Nor do we understand the
dissent to take the position that schools are required to
tolerate student advocacy of illegal drug use at school
events, even if that advocacy falls short of inviting "immi-
nent" lawless action. See *post,* at 7 ("[I]t is possible that
our rigid imminence requirement ought to be relaxed at

schools"). And even the dissent recognizes that the issues here are close enough that the principal should not be held liable in damages, but should instead enjoy qualified immunity for her actions. See *post,* at 1. Stripped of rhetorical flourishes, then, the debate between the dissent and this opinion is less about constitutional first principles than about whether Frederick's banner constitutes promotion of illegal drug use. We have explained our view that it does. The dissent's contrary view on that relatively narrow question hardly justifies sounding the First Amendment bugle.

\*        \*        \*

School principals have a difficult job, and a vitally important one. When Frederick suddenly and unexpectedly unfurled his banner, Morse had to decide to act—or not act—on the spot. It was reasonable for her to conclude that the banner promoted illegal drug use—in violation of established school policy—and that failing to act would send a powerful message to the students in her charge, including Frederick, about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers.

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–278

———————

## DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE THOMAS, concurring.

The Court today decides that a public school may pro-hibit speech advocating illegal drug use. I agree and therefore join its opinion in full. I write separately to state my view that the standard set forth in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), is without basis in the Constitution.

I

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." As this Court has previously observed, the First Amendment was not originally understood to permit all sorts of speech; instead, "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional prob-lem." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942); see also *Cox* v. *Louisiana*, 379 U. S. 536, 554 (1965). In my view, the history of public education sug-gests that the First Amendment, as originally understood, does not protect student speech in public schools. Al-though colonial schools were exclusively private, public education proliferated in the early 1800's. By the time the States ratified the Fourteenth Amendment, public schools had become relatively common. W. Reese, America's

Public Schools: From the Common School to "No Child Left Behind" 11–12 (2005) (hereinafter Reese). If students in public schools were originally understood as having free-speech rights, one would have expected 19th-century public schools to have respected those rights and courts to have enforced them.[1] They did not.

## A

During the colonial era, private schools and tutors offered the only educational opportunities for children, and teachers managed classrooms with an iron hand. R. Butts & L. Cremin, A History of Education in American Culture 121, 123 (1953) (hereinafter Butts). Public schooling arose, in part, as a way to educate those too poor to afford private schools. See Kaestle & Vinovskis, From Apron Strings to ABCs: Parents, Children, and Schooling in Nineteenth-Century Massachusetts, 84 Am. J. Sociology S39, S49 (Supp. 1978). Because public schools were initially created as substitutes for private schools, when States developed public education systems in the early 1800's, no one doubted the government's ability to educate and discipline children as private schools did. Like their private counterparts, early public schools were not places for freewheeling debates or exploration of competing ideas. Rather, teachers instilled "a core of common values" in students and taught them self-control. Reese 23; A. Potter & G. Emerson, The School and the Schoolmaster: A Manual 125 (1843) ("By its discipline it contributes, insensibly, to generate a spirit of subordination to lawful authority, a power of self-control, and a habit of postponing present indulgence to a greater future good . . ."); D. Parkerson &

---

[1] Although the First Amendment did not apply to the States until at least the ratification of the Fourteenth Amendment, most state constitutions included free-speech guarantees during the period when public education expanded. *E.g.*, Cal. Const., Art. I, §9 (1849); Conn. Const., Art. I, §5 (1818); Ind. Const., Art. I, §9 (1816).

J. Parkerson, The Emergence of the Common School in the U. S. Countryside 6 (1998) (hereinafter Parkerson) (noting that early education activists, such as Benjamin Rush, believed public schools "help[ed] control the innate selfishness of the individual").

Teachers instilled these values not only by presenting ideas but also through strict discipline. Butts 274–275. Schools punished students for behavior the school considered disrespectful or wrong. Parkerson 65 (noting that children were punished for idleness, talking, profanity, and slovenliness). Rules of etiquette were enforced, and courteous behavior was demanded. Reese 40. To meet their educational objectives, schools required absolute obedience. C. Northend, The Teacher's Assistant or Hints and Methods in School Discipline and Instruction 44, 52 (1865) ("I consider a school judiciously governed, where order prevails; where the strictest sense of propriety is manifested by the pupils towards the teacher, and towards each other . . ." (internal quotation marks omitted)).[2]

In short, in the earliest public schools, teachers taught, and students listened. Teachers commanded, and students obeyed. Teachers did not rely solely on the power of ideas to persuade; they relied on discipline to maintain order.

## B

Through the legal doctrine of *in loco parentis*, courts upheld the right of schools to discipline students, to en-

---

[2] Even at the college level, strict obedience was required of students: "The English model fostered absolute institutional control of students by faculty both inside and outside the classroom. At all the early American schools, students lived and worked under a vast array of rules and restrictions. This one-sided relationship between the student and the college mirrored the situation at English schools where the emphasis on hierarchical authority stemmed from medieval Christian theology and the unique legal privileges afforded the university corporation." Note, 44 Vand. L. Rev. 1135, 1140 (1991) (footnote omitted).

force rules, and to maintain order.[3]  Rooted in the English
common law, *in loco parentis* originally governed the legal
rights and obligations of tutors and private schools.  1 W.
Blackstone, Commentaries on the Laws of England 441
(1765) ("[A parent] may also delegate part of his parental
authority, during his life, to the tutor or schoolmaster of
his child; who is then *in loco parentis*, and has such a
portion of the power of the parent committed to his charge,
viz. that of restraint and correction, as may be necessary
to answer the purposes for which he is employed").  Chan-
cellor James Kent noted the acceptance of the doctrine as
part of American law in the early 19th century.  2 J. Kent,
Commentaries on American Law *205, *206–*207 ("So the
power allowed by law to the parent over the person of the
child may be delegated to a tutor or instructor, the better
to accomplish the purpose of education").

As early as 1837, state courts applied the *in loco par-
entis* principle to public schools:

> "One of the most sacred duties of parents, is to train
> up and qualify their children, for becoming useful and
> virtuous members of society; this duty cannot be effec-
> tually performed without the ability to command obe-
> dience, to control stubbornness, to quicken diligence,
> and to reform bad habits . . . .  The teacher is the sub-
> stitute of the parent; . . . and in the exercise of these
> delegated duties, is invested with his power." *State* v.

---

[3] My discussion is limited to elementary and secondary education.  In
these settings, courts have applied the doctrine of *in loco parentis*
regardless of the student's age.  See, *e.g., Stevens* v. *Fassett,* 27 Me. 266,
281 (1847) (holding that a student over the age of 21 is "liab[le] to
punishment" on the same terms as other students if he "present[s]
himself as a pupil, [and] is received and instructed by the master");
*State* v. *Mizner*, 45 Iowa 248, 250–252 (1876) (same); *Sheehan* v.
*Sturges*, 53 Conn. 481, 484, 2 A. 841, 843 (1885) (same).  Therefore, the
fact that Frederick was 18 and not a minor under Alaska law, 439 F. 3d
1114, 1117, n. 4 (CA9 2006), is inconsequential.

*Pendergrass*, 19 N. C. 365, 365–366, (1837).

Applying *in loco parentis*, the judiciary was reluctant to interfere in the routine business of school administration, allowing schools and teachers to set and enforce rules and to maintain order. *Sheehan* v. *Sturges,* 53 Conn. 481, 483–484, 2 A. 841, 842 (1885). Thus, in the early years of public schooling, schools and teachers had considerable discretion in disciplinary matters:

> "To accomplish th[e] desirable ends [of teaching self-restraint, obedience, and other civic virtues], the master of a school is necessarily invested with much discretionary power. . . . He must govern these pupils, quicken the slothful, spur the indolent, restrain the impetuous, and control the stubborn. He must make rules, give commands, and punish disobedience. What rules, what commands, and what punishments shall be imposed, are necessarily largely within the discretion of the master, where none are defined by the school board." *Patterson* v. *Nutter*, 78 Me. 509, 511, 7 A. 273, 274 (1886).[4]

A review of the case law shows that *in loco parentis* allowed schools to regulate student speech as well. Courts routinely preserved the rights of teachers to punish speech that the school or teacher thought was contrary to the interests of the school and its educational goals. For example, the Vermont Supreme Court upheld the corporal punishment of a student who called his teacher *"Old Jack Seaver"* in front of other students. *Lander* v. *Seaver*, 32 Vt. 114, 115 (1859). The court explained its decision as

---

[4] Even courts that did not favor the broad discretion given to teachers to impose corporal punishment recognized that the law provided it. *Cooper* v. *McJunkin*, 4 Ind. 290, 291 (1853) (stating that "[t]he public seem to cling to a despotism in the government of schools which has been discarded everywhere else").

follows:

> "[L]anguage used to other scholars to stir up disorder
> and subordination, or to heap odium and disgrace
> upon the master; writings and pictures placed so as to
> suggest evil and corrupt language, images and
> thoughts to the youth who must frequent the school;
> all such or similar acts tend directly to impair the use-
> fulness of the school, the welfare of the scholars and
> the authority of the master.  By common consent and
> by the universal custom in our New England schools,
> the master has always been deemed to have the right
> to punish such offences.  Such power is essential to
> the preservation of order, decency, decorum and good
> government in schools." *Id.*, at 121.

Similarly, the California Court of Appeal upheld the
expulsion of a student who gave a speech before the stu-
dent body that criticized the administration for having an
unsafe building "because of the possibility of fire." *Wooster*
v. *Sunderland*, 27 Cal. App. 51, 52, 148 P. 959, (1915).
The punishment was appropriate, the court stated, be-
cause the speech "was intended to discredit and humiliate
the board in the eyes of the students, and tended to impair
the discipline of the school."  *Id.*, at 55, 148 P., at 960.
Likewise, the Missouri Supreme Court explained that a
"rule which forbade the use of profane language [and]
quarrelling" "was not only reasonable, but necessary to the
orderly conduct of the school."  *Deskins* v. *Gose*, 85 Mo.
485, 487, 488 (1885).  And the Indiana Supreme Court
upheld the punishment of a student who made distracting
demonstrations in class for "a breach of good deportment."
*Vanvactor* v. *State*, 113 Ind. 276, 281, 15 N. E. 341, 343
(1888).[5]

––––––––
[5] Courts also upheld punishment when children refused to speak after
being requested to do so by their teachers.  See *Board of Ed.* v. *Helston*,
32 Ill. App. 300, 305–307 (1890) (upholding the suspension of a boy who

The doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way.  It merely limited the imposition of excessive physical punishment.  In this area, the case law was split. One line of cases specified that punishment was wholly discretionary as long as the teacher did not act with legal malice or cause permanent injury.  *E.g., Boyd* v. *State*, 88 Ala. 169, 170–172, 7 So. 268, 269 (1890) (allowing liability where the "punishment inflicted is immoderate or excessive, and . . . it was induced by legal malice, or wickedness of motive").  Another line allowed courts to intervene where the corporal punishment was "*clearly* excessive." *E.g., Lander, supra*, at 124.  Under both lines of cases, courts struck down only punishments that were excessively harsh; they almost never questioned the substantive restrictions on student conduct set by teachers and schools.  *E.g., Sheehan, supra*, at 483–484, 2 A., at 842; *Gardner* v. *State*, 4 Ind. 632, 635 (1853); *Anderson* v. *State*, 40 Tenn. 455, 456 (1859); *Hardy* v. *James*, 5 Ky. Op. 36 (1872).[6]

--------

refused to provide information about who had defaced the school building); cf. *Sewell* v. *Board of Ed. of Defiance Union School,* 29 Ohio St. 89, 92 (1876) (upholding the suspension of a student who failed to complete a rhetorical exercise in the allotted time).

[6] At least nominally, this Court has continued to recognize the applicability of the *in loco parentis* doctrine to public schools.  See *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 654, 655 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination . . . .  They are subject . . . to the control of their parents or guardians.  When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them" (citation omitted)); *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 684 (1986) ("These cases recognize the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech").

## II

*Tinker* effected a sea change in students' speech rights, extending them well beyond traditional bounds. The case arose when a school punished several students for wearing black armbands to school to protest the Vietnam War. *Tinker*, 393 U. S., at 504. Determining that the punishment infringed the students' First Amendment rights, this Court created a new standard for students' freedom of speech in public schools:

> "[W]here there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained." *Id.,* at 509 (internal quotation marks omitted).

Accordingly, unless a student's speech would disrupt the educational process, students had a fundamental right to speak their minds (or wear their armbands)—even on matters the school disagreed with or found objectionable. *Ibid.* ("[The school] must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

Justice Black dissented, criticizing the Court for "subject[ing] all the public schools in the country to the whims and caprices of their loudest-mouthed, but maybe not their brightest, students." *Id.*, at 525. He emphasized the instructive purpose of schools: "[T]axpayers send children to school on the premise that at their age they need to learn, not teach." *Id.*, at 522. In his view, the Court's decision "surrender[ed] control of the American public school system to public school students." *Id.*, at 526.

Of course, *Tinker*'s reasoning conflicted with the traditional understanding of the judiciary's role in relation to public schooling, a role limited by *in loco parentis*. Per-

haps for that reason, the Court has since scaled back *Tinker*'s standard, or rather set the standard aside on an ad hoc basis. In *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 677, 678 (1986), a public school suspended a student for delivering a speech that contained "an elaborate, graphic, and explicit sexual metaphor." The Court of Appeals found that the speech caused no disruption under the *Tinker* standard, and this Court did not question that holding. 478 U. S., at 679–680. The Court nonetheless permitted the school to punish the student because of the objectionable content of his speech. *Id.*, at 685 ("A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students"). Signaling at least a partial break with *Tinker*, *Fraser* left the regulation of indecent student speech to local schools.[7] 478 U. S., at 683.

Similarly, in *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988), the Court made an exception to *Tinker* for school-sponsored activities. The Court characterized newspapers and similar school-sponsored activities "as part of the school curriculum" and held that "[e]ducators are entitled to exercise greater control over" these forms of student expression. 484 U. S., at 271. Accordingly, the Court expressly refused to apply *Tinker*'s standard. 484 U. S., at 272–273. Instead, for school-sponsored activities, the Court created a new standard that permitted school regulations of student speech that are "reasonably related to legitimate pedagogical concerns." *Id.*, at 273.

Today, the Court creates another exception. In doing so, we continue to distance ourselves from *Tinker*, but we neither overrule it nor offer an explanation of when it operates and when it does not. *Ante*, at 10–14. I am afraid that our jurisprudence now says that students have

_____

[7] Distancing itself from *Tinker*'s approach, the *Fraser* Court quoted Justice Black's dissent in *Tinker*. 478 U. S., at 686.

a right to speak in schools except when they don't—a standard continuously developed through litigation against local schools and their administrators. In my view, petitioners could prevail for a much simpler reason: As originally understood, the Constitution does not afford students a right to free speech in public schools.

## III

In light of the history of American public education, it cannot seriously be suggested that the First Amendment "freedom of speech" encompasses a student's right to speak in public schools. Early public schools gave total control to teachers, who expected obedience and respect from students. And courts routinely deferred to schools' authority to make rules and to discipline students for violating those rules. Several points are clear: (1) under *in loco parentis*, speech rules and other school rules were treated identically; (2) the *in loco parentis* doctrine imposed almost no limits on the types of rules that a school could set while students were in school; and (3) schools and teachers had tremendous discretion in imposing punishments for violations of those rules.

It might be suggested that the early school speech cases dealt only with slurs and profanity. But that criticism does not withstand scrutiny. First, state courts repeatedly reasoned that schools had discretion to impose discipline to maintain order. The substance of the student's speech or conduct played no part in the analysis. Second, some cases involved punishment for speech on weightier matters, for instance a speech criticizing school administrators for creating a fire hazard. See *Wooster*, 27 Cal. App., at 52–53, 148 P., at 959. Yet courts refused to find an exception to *in loco parentis* even for this advocacy of public safety.

To be sure, our educational system faces administrative and pedagogical challenges different from those faced by

19th-century schools. And the idea of treating children as though it were still the 19th century would find little support today. But I see no constitutional imperative requiring public schools to allow all student speech. Parents decide whether to send their children to public schools. Cf. *Hamilton* v. *Regents of Univ. of Cal.*, 293 U. S. 245, 262 (1934) ("California has not drafted or called them to attend the university. They are seeking education offered by the State and at the same time insisting that they be excluded from the prescribed course . . ."); *id.*, at 266 (Cardozo, J., concurring). If parents do not like the rules imposed by those schools, they can seek redress in school boards or legislatures; they can send their children to private schools or home school them; or they can simply move. Whatever rules apply to student speech in public schools, those rules can be challenged by parents in the political process.

In place of that democratic regime, *Tinker* substituted judicial oversight of the day-to-day affairs of public schools. The *Tinker* Court made little attempt to ground its holding in the history of education or in the original understanding of the First Amendment.[8] Instead, it im-

---

[8] The *Tinker* Court claimed that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." 393 U. S., at 506. But the cases the Court cited in favor of that bold proposition do not support it. *Tinker* chiefly relies upon *Meyer* v. *Nebraska*, 262 U. S. 390 (1923) (striking down a law prohibiting the teaching of German). However, *Meyer* involved a challenge by a *private* school, *id.*, at 396, and the *Meyer* Court was quick to note that no "challenge [has] been made of the State's power to prescribe a curriculum for institutions which it supports." *Id.*, at 402. *Meyer* provides absolutely no support for the proposition that that free-speech rights apply within schools operated by the State. And notably, *Meyer* relied as its chief support on the *Lochner* v. *New York,* 198 U. S. 45 (1905), line of cases, 262 U. S., at 399, a line of cases that has long been criticized, *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S.

posed a new and malleable standard: Schools could not inhibit student speech unless it "substantially interfere[d] with the requirements of appropriate discipline in the operation of the school." 393 U. S., at 509 (internal quotation marks omitted). Inherent in the application of that standard are judgment calls about what constitutes interference and what constitutes appropriate discipline. See *id.*, at 517–518 (Black, J., dissenting) (arguing that the armbands in fact caused a disruption). Historically, courts reasoned that only local school districts were entitled to make those calls. The *Tinker* Court usurped that traditional authority for the judiciary.

And because *Tinker* utterly ignored the history of public education, courts (including this one) routinely find it necessary to create ad hoc exceptions to its central premise. This doctrine of exceptions creates confusion without fixing the underlying problem by returning to first principles. Just as I cannot accept *Tinker*'s standard, I cannot subscribe to *Kuhlmeier*'s alternative. Local school boards, not the courts, should determine what pedagogical interests are "legitimate" and what rules "reasonably relat[e]" to those interests. 484 U. S., at 273.

Justice Black may not have been "a prophet or the son of a prophet," but his dissent in *Tinker* has proved prophetic. 393 U. S., at 525. In the name of the First Amendment, *Tinker* has undermined the traditional authority of teachers to maintain order in public schools. "Once a society that generally respected the authority of teachers, deferred to their judgment, and trusted them to act in the best interest of school children, we now accept defiance, disrespect, and disorder as daily occurrences in many of

_____

___ (2007). *Tinker* also relied on *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925). *Pierce* has nothing to say on this issue either. *Pierce* simply upheld the right of parents to send their children to private school. *Id.*, at 535.

our public schools." Dupre, Should Students Have Constitutional Rights? Keeping Order in the Public Schools, 65 Geo. Wash. L. Rev. 49, 50 (1996). We need look no further than this case for an example: Frederick asserts a constitutional right to utter at a school event what is either "[g]ibberish," *ante*, at 7, or an open call to use illegal drugs. To elevate such impertinence to the status of constitutional protection would be farcical and would indeed be to "surrender control of the American public school system to public school students." *Tinker, supra*, at 526 (Black, J., dissenting).

*     *     *

I join the Court's opinion because it erodes *Tinker*'s hold in the realm of student speech, even though it does so by adding to the patchwork of exceptions to the *Tinker* standard. I think the better approach is to dispense with *Tinker* altogether, and given the opportunity, I would do so.

# SUPREME COURT OF THE UNITED STATES

————————

No. 06–278

————————

## DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE ALITO, with whom JUSTICE KENNEDY joins,
concurring.

I join the opinion of the Court on the understanding that
(a) it goes no further than to hold that a public school may
restrict speech that a reasonable observer would interpret
as advocating illegal drug use and (b) it provides no sup-
port for any restriction of speech that can plausibly be
interpreted as commenting on any political or social issue,
including speech on issues such as "the wisdom of the war
on drugs or of legalizing marijuana for medicinal use."
See *post*, at 13 (STEVENS, J., dissenting).

The opinion of the Court correctly reaffirms the recogni-
tion in *Tinker* v. *Des Moines Independent Community
School Dist.*, 393 U. S. 503, 506 (1969), of the fundamental
principle that students do not "shed their constitutional
rights to freedom of speech or expression at the school-
house gate." The Court is also correct in noting that
*Tinker,* which permits the regulation of student speech
that threatens a concrete and "substantial disruption*," id.*,
at 514, does not set out the only ground on which in-school
student speech may be regulated by state actors in a way

that would not be constitutional in other settings.

But I do not read the opinion to mean that there are necessarily any grounds for such regulation that are not already recognized in the holdings of this Court. In addition to *Tinker*, the decision in the present case allows the restriction of speech advocating illegal drug use; *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675 (1986), permits the regulation of speech that is delivered in a lewd or vulgar manner as part of a middle school program; and *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988), allows a school to regulate what is in essence the school's own speech, that is, articles that appear in a publication that is an official school organ. I join the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions.

The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school's "educational mission." See Brief for Petitioners 21; Brief for United States as *Amicus Curiae* 6. This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs. The "educational mission" of the public schools is defined by the elected and appointed public officials with authority over the schools and by the school administrators and faculty. As a result, some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of these groups.

During the *Tinker* era, a public school could have defined its educational mission to include solidarity with our soldiers and their families and thus could have attempted to outlaw the wearing of black armbands on the ground that they undermined this mission. Alternatively, a

school could have defined its educational mission to include the promotion of world peace and could have sought to ban the wearing of buttons expressing support for the troops on the ground that the buttons signified approval of war. The "educational mission" argument would give public school authorities a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment.

The public schools are invaluable and beneficent institutions, but they are, after all, organs of the State. When public school authorities regulate student speech, they act as agents of the State; they do not stand in the shoes of the students' parents. It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities. It is even more dangerous to assume that such a delegation of authority somehow strips public school authorities of their status as agents of the State. Most parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school. It is therefore wrong to treat public school officials, for purposes relevant to the First Amendment, as if they were private, nongovernmental actors standing *in loco parentis*.

For these reasons, any argument for altering the usual free speech rules in the public schools cannot rest on a theory of delegation but must instead be based on some special characteristic of the school setting. The special characteristic that is relevant in this case is the threat to the physical safety of students. School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly,

students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. Experience shows that schools can be places of special danger.

In most settings, the First Amendment strongly limits the government's ability to suppress speech on the ground that it presents a threat of violence. See *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969) *(per curiam)*. But due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence. And, in most cases, *Tinker*'s "substantial disruption" standard permits school officials to step in before actual violence erupts. See 393 U. S., at 508–509.

Speech advocating illegal drug use poses a threat to student safety that is just as serious, if not always as immediately obvious. As we have recognized in the past and as the opinion of the Court today details, illegal drug use presents a grave and in many ways unique threat to the physical safety of students. I therefore conclude that the public schools may ban speech advocating illegal drug use. But I regard such regulation as standing at the far reaches of what the First Amendment permits. I join the opinion of the Court with the understanding that the opinion does not endorse any further extension.

# SUPREME COURT OF THE UNITED STATES

No. 06–278

DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE BREYER, concurring in the judgment in part and dissenting in part.

This Court need not and should not decide this difficult First Amendment issue on the merits. Rather, I believe that it should simply hold that qualified immunity bars the student's claim for monetary damages and say no more.

I

Resolving the First Amendment question presented in this case is, in my view, unwise and unnecessary. In part that is because the question focuses upon specific content narrowly defined: May a school board punish students for speech that advocates drug use and, if so, when? At the same time, the underlying facts suggest that Principal Morse acted as she did not simply because of the specific content and viewpoint of Joseph Frederick's speech but also because of the surrounding context and manner in which Frederick expressed his views. To say that school officials might reasonably prohibit students during school-related events from unfurling 14-foot banners (with any kind of irrelevant or inappropriate message) designed to attract attention from television cameras seems unlikely to undermine basic First Amendment principles. But to hold, as the Court does, that "schools may take steps to

safeguard those entrusted to their care from speech that
can reasonably be regarded as encouraging illegal drug
use" (and that "schools" may "restrict student expression
that they reasonably regard as promoting illegal drug
use") is quite a different matter. *Ante,* at 2, 14. This
holding, based as it is on viewpoint restrictions, raises a
host of serious concerns.

One concern is that, while the holding is theoretically
limited to speech promoting the use of illegal drugs, it
could in fact authorize further viewpoint-based restric-
tions. Illegal drugs, after all, are not the only illegal sub-
stances. What about encouraging the underage consump-
tion of alcohol? Moreover, it is unclear how far the Court's
rule regarding drug advocacy extends. What about a
conversation during the lunch period where one student
suggests that glaucoma sufferers should smoke marijuana
to relieve the pain? What about deprecating commentary
about an antidrug film shown in school? And what about
drug messages mixed with other, more expressly political,
content? If, for example, Frederick's banner had read
"LEGALIZE BONG HiTS," he might be thought to receive
protection from the majority's rule, which goes to speech
"encouraging *illegal* drug use." *Ante,* at 2 (emphasis
added). But speech advocating change in drug laws might
also be perceived of as promoting the disregard of existing
drug laws.

Legal principles must treat like instances alike. Those
principles do not permit treating "drug use" separately
without a satisfying explanation of why drug use is *sui
generis.* To say that illegal drug use is harmful to stu-
dents, while surely true, does not itself constitute a satis-
fying explanation because there are many such harms.
During a real war, one less metaphorical than the war on
drugs, the Court declined an opportunity to draw narrow
subject-matter-based lines. Cf. *West Virginia Bd. of Ed.* v.
*Barnette,* 319 U. S. 624 (1943) (holding students cannot be

compelled to recite the Pledge of Allegiance during World War II). We should decline this opportunity today.

Although the dissent avoids some of the majority's pitfalls, I fear that, if adopted as law, it would risk significant interference with reasonable school efforts to maintain discipline. What is a principal to do when a student unfurls a 14-foot banner (carrying an irrelevant or inappropriate message) during a school-related event in an effort to capture the attention of television cameras? Nothing? In my view, a principal or a teacher might reasonably view Frederick's conduct, in this setting, as simply beyond the pale. And a school official, knowing that adolescents often test the outer boundaries of acceptable behavior, may believe it is important (for the offending student and his classmates) to establish when a student has gone too far.

Neither can I simply say that Morse may have taken the right action (confiscating Frederick's banner) but for the wrong reason ("drug speech"). Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence. As the majority rightly points out, the circumstances here called for a quick decision. See *ante*, at 15 (noting that "Morse had to decide to act—or not act—on the spot"). But this consideration is better understood in terms of qualified immunity than of the First Amendment. See *infra,* at 5–8.

All of this is to say that, regardless of the outcome of the constitutional determination, a decision on the underlying First Amendment issue is both difficult and unusually portentous. And that is a reason for us *not to decide* the issue unless we must.

In some instances, it is appropriate to decide a constitutional issue in order to provide "guidance" for the future. But I cannot find much guidance in today's decision. The Court makes clear that school officials may "restrict"

student speech that promotes "illegal drug use" and that they may "take steps" to "safeguard" students from speech that encourages "illegal drug use." *Ante*, at 2, 8. Beyond "steps" that prohibit the unfurling of banners at school outings, the Court does not explain just what those "restrict[ions]" or those "steps" might be.

Nor, if we are to avoid the risk of interpretations that are too broad or too narrow, is it easy to offer practically valuable guidance. Students will test the limits of acceptable behavior in myriad ways better known to schoolteachers than to judges; school officials need a degree of flexible authority to respond to disciplinary challenges; and the law has always considered the relationship between teachers and students special. Under these circumstances, the more detailed the Court's supervision becomes, the more likely its law will engender further disputes among teachers and students. Consequently, larger numbers of those disputes will likely make their way from the schoolhouse to the courthouse. Yet no one wishes to substitute courts for school boards, or to turn the judge's chambers into the principal's office.

In order to avoid resolving the fractious underlying constitutional question, we need only decide a different question that this case presents, the question of "qualified immunity." See Pet. for Cert. 23–28. The principle of qualified immunity fits this case perfectly and, by saying so, we would diminish the risk of bringing about the adverse consequences I have identified. More importantly, we should also adhere to a basic constitutional obligation by avoiding unnecessary decision of constitutional questions. See *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented on the record, if there is also present some other ground upon which the case may be disposed of").

## II
### A

The defense of "qualified immunity" requires courts to enter judgment in favor of a government employee unless the employee's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). The defense is designed to protect "all but the plainly incompetent or those who knowingly violated the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986).

Qualified immunity applies here and entitles Principal Morse to judgment on Frederick's monetary damages claim because she did not clearly violate the law during her confrontation with the student. At the time of that confrontation, *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 513 (1969), indicated that school officials could not prohibit students from wearing an armband in protest of the Vietnam War, where the conduct at issue did not "materially and substantially disrupt the work and discipline of the school;" *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675 (1986), indicated that school officials could restrict a student's freedom to give a school assembly speech containing an elaborate sexual metaphor; and *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260 (1988), indicated that school officials could restrict student contributions to a school-sponsored newspaper, even without threat of imminent disruption. None of these cases clearly governs the case at hand.

The Ninth Circuit thought it "clear" that these cases did not permit Morse's actions. See 439 F. 3d 1114, 1124 (2006). That is because, in the Ninth Circuit's view, this case involved neither lewd speech, cf. *Fraser, supra,* nor school sponsored speech, cf. *Kuhlmeier, supra*, and hence *Tinker*'s substantial disruption test must guide the inquiry. See 439 F. 3d, at 1123. But unlike the Ninth Cir-

cuit, other courts have described the tests these cases suggest as complex and often difficult to apply. See, *e.g.*, *Guiles ex rel. Guiles* v. *Marineau*, 461 F. 3d 320, 326 (CA2 2006) ("It is not entirely clear whether *Tinker*'s rule applies to all student speech that is not sponsored by schools, subject to the rule of *Fraser*, or whether it applies only to political speech or to political viewpoint-based discrimination"); *Baxter* v. *Vigo Cty. School Corp.*, 26 F. 3d 728, 737 (CA7 1994) (pointing out that *Fraser* "cast some doubt on the extent to which students retain free speech rights in the school setting"). Indeed, the fact that this Court divides on the constitutional question (and that the majority reverses the Ninth Circuit's constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear.

The relative ease with which we could decide this case on the qualified immunity ground, and thereby avoid deciding a far more difficult constitutional question, underscores the need to lift the rigid "order of battle" decisionmaking requirement that this Court imposed upon lower courts in *Saucier* v. *Katz*, 533 U. S. 194, 201–202 (2001). In *Saucier*, the Court wrote that lower courts' "first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Id.*, at 200. Only if there is a constitutional violation, can lower courts proceed to consider whether the official is entitled to "qualified immunity." See *ibid.*

I have previously explained why I believe we should abandon *Saucier*'s order-of-battle rule. See *Scott* v. *Harris*, 550 U. S. ___, ___ (2007) (slip op., at 1–2) (BREYER, J., concurring); *Brosseau* v. *Haugen*, 543 U. S. 194, 201–202 (2004) (BREYER, J., concurring). Sometimes the rule will require lower courts unnecessarily to answer difficult constitutional questions, thereby wasting judicial resources. Sometimes it will require them to resolve constitutional issues that are poorly presented. Sometimes the

rule will immunize an incorrect constitutional holding from further review. And often the rule violates the long-standing principle that courts should "not . . . pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944).

This last point warrants amplification. In resolving the underlying constitutional question, we produce several differing opinions. It is utterly unnecessary to do so. Were we to decide this case on the ground of qualified immunity, our decision would be *unanimous*, for the dissent concedes that Morse should not be held liable in damages for confiscating Frederick's banner. *Post*, at 1 (opinion of STEVENS, J.). And the "cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc.* v. *Drug Enforcement Admin.*, 362 F. 3d 786, 799 (CADC 2004) (Roberts, J., concurring in part and concurring in judgment).

If it is *Saucier* that tempts this Court to adhere to the rigid "order of battle" that binds lower courts, it should resist that temptation. *Saucier* does not bind this Court. Regardless, the rule of *Saucier* has generated considerable criticism from both commentators and judges. See Leval, Judging Under the Constitution: Dicta About Dicta, 81 N. Y. U. L. Rev. 1249, 1275 (2006) (calling the requirement "a puzzling misadventure in constitutional dictum"); *Dirrane* v. *Brookline Police Dept.*, 315 F. 3d 65, 69–70 (CA1 2002) (referring to the requirement as "an uncomfortable exercise" when "the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed"); *Lyons* v. *Xenia*, 417 F. 3d 565, 580–584 (CA6 2005) (Sutton, J., concurring). While *Saucier* justified its rule by contending that it was necessary to permit constitutional law to develop, see 533 U. S., at 201, this concern is overstated because overruling *Saucier* would

not mean that the law *prohibited* judges from passing on constitutional questions, only that it did not *require* them to do so. Given that *Saucier* is a judge-made procedural rule, *stare decisis* concerns supporting preservation of the rule are weak. See, *e.g.*, *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991) ("Considerations in favor of *stare decisis*" are at their weakest in cases "involving procedural and evidentiary rules").

Finally, several Members of this Court have previously suggested that *always* requiring lower courts first to answer constitutional questions is misguided. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 859 (1998) (STEVENS, J., concurring in judgment) (resolving the constitutional question first is inappropriate when that "question is both difficult and unresolved"); *Bunting* v. *Mellen*, 541 U. S. 1019, 1025 (2004) (SCALIA, J., dissenting from denial of certiorari) ("We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case"); *Saucier, supra*, at 210 (GINSBURG, J., concurring in judgment) ("The two-part test today's decision imposes holds large potential to confuse"); *Siegert* v. *Gilley*, 500 U. S. 226, 235 (1991) (KENNEDY, J., concurring) ("If it is plain that a plaintiff's required malice allegations are insufficient but there is some doubt as to the constitutional right asserted, it seems to reverse the usual ordering of issues to tell the trial and appellate courts that they should resolve the constitutional question first"). I would end the failed *Saucier* experiment now.

B

There is one remaining objection to deciding this case on the basis of qualified immunity alone. The plaintiff in this case has sought not only damages; he has also sought an injunction requiring the school district to expunge his suspension from its records. A "qualified immunity" de-

fense applies in respect to damages actions, but not to injunctive relief. See, *e.g.*, *Wood* v. *Strickland*, 420 U. S. 308, 314, n. 6 (1975). With respect to that claim, the underlying question of constitutionality, at least conceivably, remains.

I seriously doubt, however, that it does remain. At the plaintiff's request, the school superintendent reviewed Frederick's 10-day suspension. The superintendent, in turn, reduced the suspension to the eight days that Frederick had served before the appeal. But in doing so the superintendent noted that several actions independent of Frederick's speech supported the suspension, including the plaintiff's disregard of a school official's instruction, his failure to report to the principal's office on time, his "defiant [and] disruptive behavior," and the "belligerent attitude" he displayed when he finally reported. App. to Pet. for Cert. 65a. The superintendent wrote that "were" he to "concede" that Frederick's "speech . . . is protected, . . . the remainder of his behavior was not excused." *Id.,* at 66a.

The upshot is that the school board's refusal to erase the suspension from the record may well be justified on non-speech-related grounds. In addition, plaintiff's counsel appeared to agree with the Court's suggestion at oral argument that Frederick "would not pursue" injunctive relief if he prevailed on the damages question. Tr. of Oral Arg. 46–48. And finding that Morse was entitled to qualified immunity would leave only the question of injunctive relief.

Given the high probability that Frederick's request for an injunction will not require a court to resolve the constitutional issue, see *Ashwander*, 297 U. S., at 347 (Brandeis, J., concurring), I would decide only the qualified immunity question and remand the rest of the case for an initial consideration.

# SUPREME COURT OF THE UNITED STATES

———

No. 06–278

———

## DEBORAH MORSE, ET AL., PETITIONERS *v.* JOSEPH FREDERICK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

A significant fact barely mentioned by the Court sheds a revelatory light on the motives of both the students and the principal of Juneau-Douglas High School (JDHS). On January 24, 2002, the Olympic Torch Relay gave those Alaska residents a rare chance to appear on national television. As Joseph Frederick repeatedly explained, he did not address the curious message—"BONG HiTS 4 JESUS"—to his fellow students. He just wanted to get the camera crews' attention. Moreover, concern about a nationwide evaluation of the conduct of the JDHS student body would have justified the principal's decision to remove an attention-grabbing 14-foot banner, even if it had merely proclaimed "Glaciers Melt!"

I agree with the Court that the principal should not be held liable for pulling down Frederick's banner. See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). I would hold, however, that the school's interest in protecting its students from exposure to speech "reasonably regarded as promoting illegal drug use," *ante*, at 1, cannot justify disciplining Frederick for his attempt to make an ambiguous statement to a television audience simply because it contained an oblique reference to drugs. The First Amendment demands more, indeed, much more.

The Court holds otherwise only after laboring to estab-
lish two uncontroversial propositions: first, that the con-
stitutional rights of students in school settings are not
coextensive with the rights of adults, see *ante*, at 8–12;
and second, that deterring drug use by schoolchildren is a
valid and terribly important interest, see *ante*, at 12–14.
As to the first, I take the Court's point that the message
on Frederick's banner is not *necessarily* protected speech,
even though it unquestionably would have been had the
banner been unfurled elsewhere.  As to the second, I am
willing to assume that the Court is correct that the press-
ing need to deter drug use supports JDHS's rule prohibit-
ing willful conduct that expressly "advocates the use of
substances that are illegal to minors."  App. to Pet. for
Cert. 53a.  But it is a gross non sequitur to draw from
these two unremarkable propositions the remarkable
conclusion that the school may suppress student speech
that was never meant to persuade anyone to do anything.

In my judgment, the First Amendment protects student
speech if the message itself neither violates a permissible
rule nor expressly advocates conduct that is illegal and
harmful to students.  This nonsense banner does neither,
and the Court does serious violence to the First Amend-
ment in upholding—indeed, lauding—a school's decision to
punish Frederick for expressing a view with which it
disagreed.

I

In December 1965, we were engaged in a controversial
war, a war that "divided this country as few other issues
ever have." *Tinker* v. *Des Moines Independent Community
School Dist.*, 393 U. S. 503, 524 (1969) (Black, J., dissent-
ing).  Having learned that some students planned to wear
black armbands as a symbol of opposition to the country's
involvement in Vietnam, officials of the Des Moines public
school district adopted a policy calling for the suspension

of any student who refused to remove the armband. As we explained when we considered the propriety of that policy, "[t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.,* at 508. The district justified its censorship on the ground that it feared that the expression of a controversial and unpopular opinion would generate disturbances. Because the school officials had insufficient reason to believe that those disturbances would "materially and substantially interfere with the requirements of discipline in the operation of the school," we found the justification for the rule to lack any foundation and therefore held that the censorship violated the First Amendment. *Id.,* at 509 (internal quotation marks omitted).

Justice Harlan dissented, but not because he thought the school district could censor a message with which it disagreed. Rather, he would have upheld the district's rule only because the students never cast doubt on the district's anti-disruption justification by proving that the rule was motivated "by other than legitimate school concerns—for example, a desire to prohibit the expression of an unpopular point of view while permitting expression of the dominant opinion." *Id.,* at 526.

Two cardinal First Amendment principles animate both the Court's opinion in *Tinker* and Justice Harlan's dissent. First, censorship based on the content of speech, particularly censorship that depends on the viewpoint of the speaker, is subject to the most rigorous burden of justification:

> "Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. View-

point discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–829 (1995) (citation omitted).

Second, punishing someone for advocating illegal conduct is constitutional only when the advocacy is likely to provoke the harm that the government seeks to avoid. See *Brandenburg* v. *Ohio*, 395 U. S. 444, 449 (1969) *(per curiam)* (distinguishing "mere advocacy" of illegal conduct from "incitement to imminent lawless action").

However necessary it may be to modify those principles in the school setting, *Tinker* affirmed their continuing vitality. 393 U. S., at 509 ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in that conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained" (internal quotation marks omitted)). As other federal courts have long recognized, under *Tinker*,

> "regulation of student speech is generally permissible only when the speech would substantially disrupt or interfere with the work of the school or the rights of other students. . . . *Tinker* requires a specific and significant fear of disruption, *not just some remote apprehension of disturbance.*" *Saxe* v. *State College Area School Dist.*, 240 F. 3d 200, 211 (CA3 2001) (Alito, J.) (emphasis added).

Yet today the Court fashions a test that trivializes the two cardinal principles upon which *Tinker* rests. See *ante*, at 14 ("[S]chools [may] restrict student expression that they reasonably regard as promoting illegal drug use"). The Court's test invites stark viewpoint discrimination. In this case, for example, the principal has unabashedly acknowledged that she disciplined Frederick because she disagreed with the pro-drug viewpoint she ascribed to the message on the banner, see App. 25—a viewpoint, incidentally, that Frederick has disavowed, see *id.,* at 28. Unlike our recent decision in *Tennessee Secondary School Athletic Assn.* v. *Brentwood Academy*, 551 U. S. ___, ___ (2007) (slip op., at 3), see also *ante*, at 3 (ALITO, J., concurring), the Court's holding in this case strikes at "the heart of the First Amendment" because it upholds a punishment meted out on the basis of a listener's disagreement with her understanding (or, more likely, misunderstanding) of the speaker's viewpoint. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989).

It is also perfectly clear that "promoting illegal drug use," *ante*, at 14, comes nowhere close to proscribable "incitement to imminent lawless action." *Brandenburg*, 395 U. S., at 447. Encouraging drug use might well increase the likelihood that a listener will try an illegal drug, but that hardly justifies censorship:

> "Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability. . . . Advocacy of law-breaking heightens it still further. But even advocacy of violation, however reprehensible morally, is not a justification for denying

free speech where the advocacy falls short of incite-
ment and there is nothing to indicate that the advo-
cacy would be immediately acted upon." *Whitney* v.
*California*, 274 U. S. 357, 376 (1927) (Brandeis, J.,
concurring).

No one seriously maintains that drug advocacy (much less
Frederick's ridiculous sign) comes within the vanishingly
small category of speech that can be prohibited because of
its feared consequences. Such advocacy, to borrow from
Justice Holmes, "ha[s] no chance of starting a present
conflagration." *Gitlow* v. *New York*, 268 U. S. 652, 673
(1925) (dissenting opinion).

## II

The Court rejects outright these twin foundations of
*Tinker* because, in its view, the unusual importance of
protecting children from the scourge of drugs supports a
ban on all speech in the school environment that promotes
drug use. Whether or not such a rule is sensible as a
matter of policy, carving out pro-drug speech for uniquely
harsh treatment finds no support in our case law and is
inimical to the values protected by the First Amendment.[1]
See *infra*, at 14–16.

I will nevertheless assume for the sake of argument that
the school's concededly powerful interest in protecting its
students adequately supports its restriction on "any as-
sembly or public expression that . . . advocates the use of
substances that are illegal to minors . . . ." App. to Pet. for
Cert. 53a. Given that the relationship between schools
and students "is custodial and tutelary, permitting a
degree of supervision and control that could not be exer-
cised over free adults," *Vernonia School Dist. 47J* v. *Acton*,

---

[1] I also seriously question whether such a ban could really be en-
forced. Consider the difficulty of monitoring student conversations
between classes or in the cafeteria.

515 U. S. 646, 655 (1995), it might well be appropriate to tolerate some targeted viewpoint discrimination in this unique setting. And while conventional speech may be restricted only when likely to "incit[e] imminent lawless action," *Brandenburg*, 395 U. S., at 449, it is possible that our rigid imminence requirement ought to be relaxed at schools. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 682 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings").

But it is one thing to restrict speech that *advocates* drug use. It is another thing entirely to prohibit an obscure message with a drug theme that a third party subjectively—and not very reasonably—thinks is tantamount to express advocacy. Cf. *Masses Publishing Co.* v. *Patten*, 244 F. 535, 540, 541 (SDNY 1917) (Hand, J.) (distinguishing sharply between "agitation, legitimate as such" and "the direct advocacy" of unlawful conduct). Even the school recognizes the paramount need to hold the line between, on the one hand, non-disruptive speech that merely expresses a viewpoint that is unpopular or contrary to the school's preferred message, and on the other hand, advocacy of an illegal or unsafe course of conduct. The district's prohibition of drug advocacy is a gloss on a more general rule that is otherwise quite tolerant of non-disruptive student speech:

> "Students will not be disturbed in the exercise of their constitutionally guaranteed rights to assemble peaceably and to express ideas and opinions, privately or publicly, provided that their activities do not infringe on the rights of others and do not interfere with the operation of the educational program.
>
> "The Board will not permit the conduct on school premises of any willful activity . . . that interferes with the orderly operation of the educational program

or offends the rights of others. The Board specifically
prohibits . . . any assembly or public expression that
. . . advocates the use of substances that are illegal to
minors . . . ." App. to Pet. for Cert. 53a; see also *ante*,
at 3 (quoting rule in part).

There is absolutely no evidence that Frederick's banner's
reference to drug paraphernalia "willful[ly]" infringed on
anyone's rights or interfered with any of the school's edu-
cational programs.[2] On its face, then, the rule gave Fre-
derick wide berth "to express [his] ideas and opinions" so
long as they did not amount to "advoca[cy]" of drug use.
*Ibid.* If the school's rule is, by hypothesis, a valid one, it is
valid only insofar as it scrupulously preserves adequate
space for constitutionally protected speech. When First
Amendment rights are at stake, a rule that "sweep[s] in a
great variety of conduct under a general and indefinite
characterization" may not leave "too wide a discretion in
its application." *Cantwell* v. *Connecticut*, 310 U. S. 296,
308 (1940). Therefore, just as we insisted in *Tinker* that
the school establish some likely connection between the
armbands and their feared consequences, so too JDHS
must show that Frederick's supposed advocacy stands a
meaningful chance of making otherwise-abstemious stu-
dents try marijuana.

But instead of demanding that the school make such a
showing, the Court punts. Figuring out just *how* it punts
is tricky; "[t]he mode of analysis [it] employ[s] is not en-
tirely clear," see *ante*, at 9. On occasion, the Court sug-
gests it is deferring to the principal's "reasonable" judg-

---

[2] It is also relevant that the display did not take place "on school
premises," as the rule contemplates. App. to Pet. for Cert. 53a. While a
separate district rule does make the policy applicable to "social events
and class trips," *id.,* at 58a, Frederick might well have thought that the
Olympic Torch Relay was neither a "social event" (for example, prom)
nor a "class trip."

ment that Frederick's sign qualified as drug advocacy.[3]  At other times, the Court seems to say that *it* thinks the banner's message constitutes express advocacy.[4]  Either way, its approach is indefensible.

To the extent the Court defers to the principal's ostensibly reasonable judgment, it abdicates its constitutional responsibility.  The beliefs of third parties, reasonable or otherwise, have never dictated which messages amount to proscribable advocacy.  Indeed, it would be a strange constitutional doctrine that would allow the prohibition of only the narrowest category of speech advocating unlawful conduct, see *Brandenburg*, 395 U. S., at 447–448, yet would permit a listener's perceptions to determine which speech deserved constitutional protection.[5]

Such a peculiar doctrine is alien to our case law.  In

———————

[3] See *ante*, at 1 (stating that the principal "reasonably regarded" Frederick's banner as "promoting illegal drug use"); *ante,* at 6 (explaining that "Principal Morse thought the banner would be interpreted by those viewing it as promoting illegal drug use, and that interpretation is plainly a reasonable one"); *ante,* at 8 (asking whether "a principal may . . . restrict student speech . . . when that speech is reasonably viewed as promoting illegal drug use"); *ante,* at 14 (holding that "schools [may] restrict student expression that they reasonably regard as promoting illegal drug use"); see also *ante*, at 1 (ALITO, J., concurring) ("[A] public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use").

[4] See *ante,* at 7 ("We agree with Morse.  At least two interpretations of the words on the banner demonstrate that the sign advocated the use of illegal drugs"); *ante,* at 15 (observing that "[w]e have explained our view" that "Frederick's banner constitutes promotion of illegal drug use").

[5] The reasonableness of the view that Frederick's message was unprotected speech is relevant to ascertaining whether qualified immunity should shield the principal from liability, not to whether her actions violated Frederick's constitutional rights.  Cf. *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

*Abrams* v. *United States*, 250 U. S. 616 (1919), this Court affirmed the conviction of a group of Russian "rebels, revolutionists, [and] anarchists," *id.*, at 617–618 (internal quotation marks omitted), on the ground that the leaflets they distributed were thought to "incite, provoke, and encourage resistance to the United States," *id.*, at 617 (internal quotation marks omitted). Yet Justice Holmes' dissent—which has emphatically carried the day—never inquired into the reasonableness of the United States' judgment that the leaflets would likely undermine the war effort. The dissent instead ridiculed that judgment: "nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so." *Id.,* at 628. In *Thomas* v. *Collins*, 323 U. S. 516 (1945) (opinion for the Court by Rutledge, J.), we overturned the conviction of a union organizer who violated a restraining order forbidding him from exhorting workers. In so doing, we held that the distinction between advocacy and incitement could not depend on how one of those workers might have understood the organizer's speech. That would "pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning." *Id.*, at 535. In *Cox* v. *Louisiana*, 379 U. S. 536, 543 (1965), we vacated a civil rights leader's conviction for disturbing the peace, even though a Baton Rouge sheriff had "deem[ed]" the leader's "appeal to . . . students to sit in at the lunch counters to be 'inflammatory.'" We never asked if the sheriff's in-person, on-the-spot judgment was "reasonable." Even in *Fraser*, we made no inquiry into whether the school administrators reasonably thought the student's speech was obscene or profane; we rather satisfied ourselves that "[t]he pervasive sexual innuendo in

Fraser's speech was plainly offensive to both teachers and students—indeed, to any mature person." 478 U. S., at 683. Cf. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 499 (1984) ("[I]n cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression" (internal quotation marks omitted)).[6]

To the extent the Court independently finds that "BONG HiTS 4 JESUS" *objectively* amounts to the advocacy of illegal drug use—in other words, that it can *most* reasonably be interpreted as such—that conclusion practically refutes itself. This is a nonsense message, not advocacy. The Court's feeble effort to divine its hidden meaning is strong evidence of that. *Ante*, at 7 (positing that the

―――――――――

[6]This same reasoning applies when the interpreter is not just a listener, but a legislature. We have repeatedly held that "[d]eference to a legislative finding" that certain types of speech are inherently harmful "cannot limit judicial inquiry when First Amendment rights are at stake," reasoning that "the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution." *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 843, 844 (1978); see also *Whitney* v. *California*, 274 U. S. 357, 378–379 (1927) (Brandeis, J., concurring) ("[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution. . . . Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was so substantial as to justify the stringent restriction interposed by the legislature"). When legislatures are entitled to no deference as to whether particular speech amounts to a "clear and present danger," *id.,* at 379, it is hard to understand why the Court would so blithely defer to the judgment of a single school principal.

banner might mean, alternatively, "'[Take] bong hits,'" "'bong hits [are a good thing],'" or "'[we take] bong hits'"). Frederick's credible and uncontradicted explanation for the message—he just wanted to get on television—is also relevant because a speaker who does not intend to persuade his audience can hardly be said to be advocating anything.[7]  But most importantly, it takes real imagination to read a "cryptic" message (the Court's characterization, not mine, see *ibid.,* at 6) with a slanting drug reference as an incitement to drug use.  Admittedly, some high school students (including those who use drugs) are dumb. Most students, however, do not shed their brains at the schoolhouse gate, and most students know dumb advocacy when they see it.  The notion that the message on this banner would actually persuade either the average student or even the dumbest one to change his or her behavior is most implausible.  That the Court believes such a silly message can be proscribed as advocacy underscores the novelty of its position, and suggests that the principle it articulates has no stopping point.

Even if advocacy could somehow be wedged into Frederick's obtuse reference to marijuana, that advocacy was at best subtle and ambiguous.  There is abundant precedent, including another opinion THE CHIEF JUSTICE announces today, for the proposition that when the "First Amendment is implicated, the tie goes to the speaker," *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. ___ (2007) (slip op., at 21) and that "when it comes to defining what speech qualifies as the functional equivalent of express advocacy . . . we give the benefit of the doubt to speech, not censorship," *post,* at 29.  If this were a close

---

[7] In affirming Frederick's suspension, the JDHS superintendent acknowledged that Frederick displayed his message "for the benefit of television cameras covering the Torch Relay."  App. to Pet. for Cert. 62a.

case, the tie would have to go to Frederick's speech, not to the principal's strained reading of his quixotic message.

Among other things, the Court's ham-handed, categorical approach is deaf to the constitutional imperative to permit unfettered debate, even among high-school students, about the wisdom of the war on drugs or of legalizing marijuana for medicinal use.[8] See *Tinker*, 393 U. S., at 511 ("[Students] may not be confined to the expression of those sentiments that are officially approved"). If Frederick's stupid reference to marijuana can in the Court's view justify censorship, then high school students everywhere could be forgiven for zipping their mouths about drugs at school lest some "reasonable" observer censor and then punish them for promoting drugs. See also *ante*, at 2 (BREYER, J., concurring in judgment in part and dissenting in part).

Consider, too, that the school district's rule draws no distinction between alcohol and marijuana, but applies evenhandedly to all "substances that are illegal to mi-

_____

[8]The Court's opinion ignores the fact that the legalization of marijuana is an issue of considerable public concern in Alaska. The State Supreme Court held in 1975 that Alaska's constitution protects the right of adults to possess less than four ounces of marijuana for personal use. *Ravin* v. *State*, 537 P. 2d 494 (Alaska). In 1990, the voters of Alaska attempted to undo that decision by voting for a ballot initiative recriminalizing marijuana possession. Initiative Proposal No. 2, §§1–2 (effective Mar. 3, 1991), 11 Alaska Stat., p. 872 (Lexis 2006). At the time Frederick unfurled his banner, the constitutionality of that referendum had yet to be tested. It was subsequently struck down as unconstitutional. See *Noy* v. *State*, 83 P. 3d 538 (Alaska App. 2003). In the meantime, Alaska voters had approved a ballot measure decriminalizing the use of marijuana for medicinal purposes, 1998 Ballot Measure No. 8 (approved Nov. 3, 1998), 11 Alaska Stat., p. 882 (codified at Alaska Stat. §§11.71.090, 17.37.010–17.37.080), and had rejected a much broader measure that would have decriminalized marijuana possession and granted amnesty to anyone convicted of marijuana-related crimes, see 2000 Ballot Measure No. 5 (failed Nov. 7, 2000), 11 Alaska Stat., p. 886.

nors." App. to Pet. for Cert. 53a; see also App. 83 (ex-pressly defining "'drugs'" to include "all alcoholic bever-ages"). Given the tragic consequences of teenage alcohol consumption—drinking causes far more fatal accidents than the misuse of marijuana—the school district's inter-est in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use. Under the Court's reasoning, must the First Amendment give way whenever a school seeks to punish a student for any speech mentioning beer, or indeed anything else that might be deemed risky to teenagers? While I find it hard to believe the Court would support punishing Frederick for flying a "WINE SiPS 4 JESUS" banner—which could quite reasonably be construed either as a protected reli-gious message or as a pro-alcohol message—the breathtak-ing sweep of its opinion suggests it would.

## III

Although this case began with a silly, nonsensical ban-ner, it ends with the Court inventing out of whole cloth a special First Amendment rule permitting the censorship of any student speech that mentions drugs, at least so long as someone could perceive that speech to contain a latent pro-drug message. Our First Amendment jurisprudence has identified some categories of expression that are less deserving of protection than others—fighting words, ob-scenity, and commercial speech, to name a few. Rather than reviewing our opinions discussing such categories, I mention two personal recollections that have no doubt influenced my conclusion that it would be profoundly unwise to create special rules for speech about drug and alcohol use.

The Vietnam War is remembered today as an unpopular war. During its early stages, however, "the dominant opinion" that Justice Harlan mentioned in his *Tinker* dissent regarded opposition to the war as unpatriotic, if

not treason. 393 U. S., at 526. That dominant opinion strongly supported the prosecution of several of those who demonstrated in Grant Park during the 1968 Democratic Convention in Chicago, see *United States* v. *Dellinger*, 472 F. 2d 340 (CA7 1972), and the vilification of vocal opponents of the war like Julian Bond, cf. *Bond* v. *Floyd*, 385 U. S. 116 (1966). In 1965, when the Des Moines students wore their armbands, the school district's fear that they might "start an argument or cause a disturbance" was well founded. *Tinker*, 393 U. S., at 508. Given that context, there is special force to the Court's insistence that "our Constitution says we must take that risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Id.,* at 508–509 (citation omitted). As we now know, the then-dominant opinion about the Vietnam War was not etched in stone.

Reaching back still further, the current dominant opinion supporting the war on drugs in general, and our anti-marijuana laws in particular, is reminiscent of the opinion that supported the nationwide ban on alcohol consumption when I was a student. While alcoholic beverages are now regarded as ordinary articles of commerce, their use was then condemned with the same moral fervor that now supports the war on drugs. The ensuing change in public opinion occurred much more slowly than the relatively rapid shift in Americans' views on the Vietnam War, and progressed on a state-by-state basis over a period of many years. But just as prohibition in the 1920's and early 1930's was secretly questioned by thousands of otherwise law-abiding patrons of bootleggers and speakeasies, today the actions of literally millions of otherwise law-abiding

users of marijuana,[9] and of the majority of voters in each of the several States that tolerate medicinal uses of the product,[10] lead me to wonder whether the fear of disapproval by those in the majority is silencing opponents of the war on drugs. Surely our national experience with alcohol should make us wary of dampening speech suggesting—however inarticulately—that it would be better to tax and regulate marijuana than to persevere in a futile effort to ban its use entirely.

Even in high school, a rule that permits only one point of view to be expressed is less likely to produce correct answers than the open discussion of countervailing views. *Whitney*, 274 U. S., at 377 (Brandeis, J., concurring); *Abrams*, 250 U. S., at 630 (Holmes, J., dissenting); *Tinker*, 393 U. S., at 512. In the national debate about a serious issue, it is the expression of the minority's viewpoint that most demands the protection of the First Amendment. Whatever the better policy may be, a full and frank discussion of the costs and benefits of the attempt to prohibit the use of marijuana is far wiser than suppression of speech because it is unpopular.

I respectfully dissent.

---

[9] See *Gonzales* v. *Raich*, 545 U. S. 1, 21, n. 31 (2005) (citing a Government estimate "that in 2000 American users spent $10.5 *billion* on the purchase of marijuana").

[10] *Id.,* at 5 (noting that "at least nine States . . . authorize the use of marijuana for medicinal purposes").